Case No. 12-1445

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ANDY KERR, et al.
           Plaintiffs-Appellees,

    v.

JOHN HICKENLOOPER,
Governor of Colorado, in his official capacity,
           Defendant-Appellant.

On Appeal from the United States District Court for the District of
Colorado
Civil Action No. 1:11-cv-01350-WJM-BNB
Judge William J. Martinez

**BRIEF FOR *AMICI* INDEPENDENCE INSTITUTE
AND
CATO INSTITUTE**

David B. Kopel
*Counsel of Record*
Independence Institute
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536 ext. 112

Ilya Shapiro
Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 842-0200
(admission to 10th Circuit pending)

# CORPORATE DISCLOSURE STATEMENT, INDEPENDENCE INSTITUTE

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy, or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate *amici* are also required to file disclosure statements. Counsel has a continuing duty to update this information.

No. <u>12-1445</u>                             Caption: <u>Kerr v. Hickenlooper</u>

Pursuant to Fed. R. App. P. 26.1, the Independence Institute, a 501(c)(3) nonprofit corporation (Colorado), who is an *amicus curiae*, makes the following disclosure:

1. Is party/*amicus* a publicly held corporation or other publicly held entity? NO

2. Does party/amicus have any parent corporations? NO

3. Is 10% or more of the stock of a parent/*amicus* owned by a publicly held corporation or other publicly held entity? NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of this litigation? NO

5. Is party a trade association? (*amici curiae* do not complete this question) N/A

6. Does this case arise out of a bankruptcy proceeding? NO


<u>/s/ *David B. Kopel*</u>

Dated: February 8, 2013

# CORPORATE DISCLOSURE STATEMENT, CATO INSTITUTE

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy, or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate *amici* are also required to file disclosure statements. Counsel has a continuing duty to update this information.

No. <u>12-1445</u>                    Caption: <u>Kerr v. Hickenlooper</u>

Pursuant to Fed. R. App. P. 26.1, Cato Institute, a 501(c)(3) nonprofit corporation (Kansas), which is an *amicus curiae*, makes the following disclosure:

1. Is party/*amicus* a publicly held corporation or other publicly held entity? NO

2. Does party/*amicus* have any parent corporations? NO

3. Is 10% or more of the stock of a parent/amicus owned by a publicly held corporation or other publicly held entity? NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of this litigation? NO

5. Is party a trade association? (*amici curiae* do not complete this question) N/A

6. Does this case arise out of a bankruptcy proceeding?  NO


<u>/s/*David B. Kopel* </u>

<u>Dated: February. 8, 2013</u>

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT, INDEPENDENCE INSTITUTE ................................................................................... ii

CORPORATE DISCLOSURE STATEMENT, CATO INSTITUTE ....... iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES .................................................................. vi

STATEMENT OF AMICI INTERESTS .................................................. ix

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ........................................................................................... 3

    I.    Although the plaintiffs' Substituted Complaint is confused, it apparently rests on the theory that any limit on legislative fiscal authority—including, but not limited to, limits imposed by initiative and referendum—violates the U.S. Constitution's Guarantee Clause. A claim based on this theory is not justiciable. ................................... 3

    II.    Congress has, under the rule in *Luther v. Borden* and *Minor v. Happersett*, authoritatively rejected the claim that initiative and referendum is inconsistent with the republican form, thereby rendering this case non-justiciable ......................................................... 7

    III.  Even if this case is justiciable, the plaintiffs' claim is utterly without merit, and therefore must be dismissed. ................................ 9

        A.    In the absence of controlling Supreme Court precedent, the phrase "republican form of government" is defined by standard sources the Supreme Court uses for interpreting constitutional language. ......................................................................................... 9

B.   Eighteenth-century dictionaries define "republic" and "republican" in a way fully consistent with citizen votes on laws and taxes. .......................................................................... 12

C.   Leading eighteenth century political works make clear that direct citizen voting on laws and taxes is "republican." ............... 17

D.   The records of the conventions that produced the Constitution show that direct citizen voting on fiscal matters and other laws is "republican." ..................................................................... 19

E.   Commentary issued while the Constitution was still under debate, including, but not limited to, *The Federalist*, also shows that citizen lawmaking was consistent with the Guarantee Clause. 21

F.   Madison's *The Federalist* No. 10 does not mean that direct citizen lawmaking is inconsistent with the republican form. ....... 24

CONCLUSION ........................................................................ 27

# TABLE OF AUTHORITIES

## Constitutional Provisions

Colo. Const. art. X, §20 ................................................................. 1, 4, 5, 6

N.M. Const., art. XIX, §3 ................................................................. 8

Okla. Const., art. V, §§1-7 ................................................................. 8

Okla. Const., art. X, §25 ................................................................. 8

U.S. Const., art. I, §3 ................................................................. 5

U.S. Const., art. I, §7 ................................................................. 6

U.S. Const., art. I, §8 ................................................................. 5, 6

U.S. Const., art. I, §9 ................................................................. 5, 6

U.S. Const., art. IV, §4 ............................................................. 1, 3, 7, 9

## Cases

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................... 4, 7, 8, 9

*Boumediene v. Bush*, 553 U.S. 723 (2008) ............................................ 10

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................... 17

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................... 10, 12

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ........................ 11-12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............ 10, 11, 13, 14

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536
    U.S. 88 (2002) ........................................................................ 12

*Luther v. Borden, 48 U.S. 1 (1849)* ........................................................ 7-8

*Lynch v. Household Finance Corp.*, 405 U.S. 538 (1972) ....................... 11

*McDonald v. City of Chicago*, 561 U.S. __, 130 S.Ct. 3020 (2010) ......... 11

*Minor v. Happersett,* 88 U.S. 162 (1875) .................................. 8, 9-10, 24

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................ 5

*Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2594 (2011) ........................... 11

## Books

ADAMS, JOHN, DEFENCE OF THE CONSTITUTIONS OF THE UNITED STATES
    (1787) ........................................................................ 11, 17, 18-19

ALLEN, FRANCIS, A COMPLETE ENGLISH DICTIONARY (1765) ................... 14

AMAR, AKHIL REED, AMERICA'S CONSTITUTION, A BIOGRAPHY (2005)... 3, 9,
    27

ASH, JOHN, A NEW AND COMPLETE DICTIONARY OF THE ENGLISH
    LANGUAGE (1775) ................................................................. 14

BAILEY, NICHOLAS, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (25th ed. 1783) ..................................................................14-15

BARLOW, FREDERICK, THE COMPLETE ENGLISH DICTIONARY (1772-73) ...15

CHAMBERS, EPHRAIM, CYCLOPAEDIA OR AN UNIVERSAL DICTIONARY OF ARTS AND SCIENCES (1783)...............................................................15-17

DEBATES ON THE FEDERAL CONSTITUTION (Jonathan Elliot ed., 1876) ..20, 21

DONALDSON, ALEXANDER, AN UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE (1763) ...................................................................15

JOHNSON, SAMUEL, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed., 1773) ...................................................................11

JOHNSON, SAMUEL, A DICTIONARY OF THE ENGLISH LANGUAGE (8th ed. 1786 ...................................................................14

MEESE, EDWIN, THE HERITAGE GUIDE TO THE CONSTITUTION (David F. Forte et al. eds., 2005) ...........................................................3

MONTESQUIUE, BARON, THE SPIRIT OF THE LAWS (1st pub. 1748)..... 11, 17, 18-19

PERRY, WILLIAM, PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (1788) ................................................................... 11, 13, 15

RECORDS OF THE FEDERAL CONVENTION OF 1787 (Max Farrand ed., 1937) ...................................................................11-12, 20-21

RICHARD, CARL, J., THE FOUNDERS AND THE CLASSICS: GREECE, ROME, AND THE AMERICAN ENLIGHTENMENT (1994)........................................20

SHERIDAN, THOMAS, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796) ................................................................... 11, 13

SHERIDAN, THOMAS, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed.1789) ...................................................................13-14

SIDNEY, ALGERNON, DISCOURSES CONCERNING GOVERNMENT (1698) (Thomas G. West ed., 1996) ...........................................................25-26

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION (Merrill Jensen et al. eds., 1978)...........................................................24

## Other Authorities

Brink, Robert K., *Timeline of the Massachusetts Constitution of 1780,* Social Law Library Research Portal..................................................................24

Duer, William, N.Y. DAILY PACKET, Nov. 16, 1787..................................22

Natelson, Robert G. & Zakary Kessler, *The Attack on Colorado's TABOR and the Threat to Other States,* Independence Institute Issue Paper no. 1-2013 (2013)....................................................................6, 7

Natelson, Robert G., *A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause*, 80 TEX. L. REV. 807 (2002) ........................................ 3, 9, 17, 18-19, 20, 21-22, 23, 25, 27

Natelson, Robert G., A Bibliography for Researching Original Understanding, Independence Institute Constitution Studies...........11

*The Federalist* No. 6 (Alexander Hamilton)....................................21

*The Federalist* No. 10 (James Madison) .........................................24-27

*The Federalist* No. 39 (James Madison) ......................................... 26

*The Federalist* No. 43 (James Madison) ........................................25

*The Federalist* No. 55 (James Madison) .................................................22

*The Federalist* No. 63 (James Madison) .................................... 21, 23, 26

## STATEMENT OF AMICI INTERESTS

This brief is filed with the consent of the attorneys for Appellant and Appellees. No counsel for a party authored the brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief.

The Independence Institute is a public policy research organization created in 1984, and founded on the eternal truths of the Declaration of Independence. The Institute has participated as an *amicus* or party in many constitutional cases in federal and state courts including *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. __ (2010); and the Affordable Care Act cases.

The Institute's *amicus* briefs in *Heller* and *McDonald* (under the name of lead *amicus*, the International Law Enforcement Educators & Trainers Association, ILEETA) were cited in the opinions of Justices Breyer (*Heller*), Alito (*McDonald*), and Stevens (*McDonald*). The Institute's research has also been cited by this Court. *United States v. McCane*, 573 F.3d 1037, 1049 n.2 (10th Cir. 2009) (concurring opinion by Judge Tymkovich); *United States v. McElhiney*, 275 F.3d 928, 935

n.2 (10th Cir. 2001) (opinion by Judge Henry, joined by Judges Kelly and Holloway).

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs. The present case concerns Cato because it involves an attack on popular sovereignty.

## SUMMARY OF ARGUMENT

Plaintiffs claim that the Colorado Taxpayer Bill of Rights, Colo. Const. art. X, § 20 (TABOR), is inconsistent with the Guarantee Clause of the United States Constitution. Exactly why is not clear from their Substituted Complaint, which is contradictory and confused. This case is not justiciable because: (1) the Substituted Complaint reveals that the plaintiffs cannot enunciate sufficiently manageable standards for justiciability; (2) the relief sought would create havoc for the constitutions of nearly all states; and (3) Congress already authoritatively decided the issues the plaintiffs raise.

Apart from issues of justiciability, plaintiffs' claim must be dismissed because it is without merit as a matter of law. Despite the plaintiffs' subsequent trimming on the point, their theory that popular restrictions on state legislatures are unconstitutional rests squarely on the long-discredited canard that initiative and referendum violate the Guarantee Clause.

As a matter of history and law, there is no factual or legal basis for the assertion that limiting a legislature's fiscal powers violates the republican form. The U.S. Constitution itself contains important fiscal

restrictions on Congress, and state constitutional restrictions on legislative fiscal power (by popular vote and otherwise) are very widespread and long standing.

Finally, the standard sources used by the U.S. Supreme Court to deduce constitutional meaning show—beyond doubt—that direct citizen voting on fiscal measures and other laws was a permitted, and even prevalent, feature of "republican" government as the term was understood by those who wrote and adopted the U.S. Constitution.

Thus, even if the plaintiffs' complaint *does* state a justiciable claim, the motion to dismiss should still be granted.

## ARGUMENT

**I. Although Plaintiffs' Substituted Complaint is confused, it apparently rests on the theory that any limit on legislative fiscal authority—including but not limited to limits imposed by initiative and referendum—violates the U.S. Constitution's Guarantee Clause. A claim based on this theory is not justiciable.**

Article IV, Section 4 of the U.S. Constitution provides as follows:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

This provision is commonly called the "Guarantee Clause."

The overriding purpose of the Guarantee Clause was to prevent any state from lapsing into, or remaining in, monarchy or dictatorship.[1] In the instant case, however, the plaintiffs seek to use the clause for the opposite purpose: to constrain popular government.

For the plaintiffs' case to be justiciable, there must be "judicially discoverable and manageable standards for resolving" their claim.

---

[1] Robert G. Natelson, *A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause*, 80 Tex. L. Rev. 807, 825 (2002) (hereinafter Natelson). *See also* Edwin Meese III, The Heritage Guide to the Constitution 283 (David F. Forte et al. eds., 2005). Professor Amar of Yale University subsequently reached similar conclusions. Akhil Reed Amar, America's Constitution, A Biography 280 (2005) (hereinafter Amar).

*Baker v. Carr*, 369 U.S. 186, 217 (1962). However, the plaintiffs themselves have difficulty enunciating any coherent standard. Their Substituted Complaint does allege that to be "republican," a state must have a "fully effective legislature" (Substituted Complaint, Civil Action No. 1:11-cv-01350-WJM-BNB, Docket #12 at pp. 17-18, ¶ 83), but it never defines that phrase. On the contrary, the precise grounds on which they claim TABOR renders the Colorado legislature less than "fully effective" varies by the paragraph. In some paragraphs, the plaintiffs claim TABOR's alleged shortcoming is the electoral restriction on the legislative power to tax. *See, e.g.*, *id.* at p. 4, ¶¶ 6 & 7; p. 15, ¶ 75 (second sentence); pp. 17-18, ¶ 83. Elsewhere, the plaintiffs claim the alleged defect lies in TABOR's spending rules. *Id.* at pp. 16-17, ¶ 79. Still elsewhere, the plaintiffs claim a "fully effective legislature" must have power to "tax and appropriate" (i.e., tax and spend). *Id.* at p. 9, ¶ 44 and p. 12, ¶ 61. In yet other paragraphs, the Substituted Complaint argues that a republican legislature must have power to "raise and appropriate" (i.e., tax, borrow, and spend). *Id.* at p.3, ¶ 3; p.4, ¶ 7; p.13, ¶ 65; and p.15, ¶ 72.

Clearly, the plaintiff's Substituted Complaint does not present

"judicially discoverable and manageable standards for resolving" the issues they present.

The Substituted Complaint's prayer for relief presents further justiciability problems. It requests invalidation of TABOR in its entirety: "a DECLARATION that the TABOR AMENDMENT is facially unconstitutional and unconstitutional as applied" and "that the TABOR AMENDMENT is null and void." Substituted Complaint, Prayers for Relief, p. 20, ¶¶ 1 & 2. This relief could be justified only if the taxing, spending, and borrowing limits imposed by TABOR are *all* invalid—that is, if to be republican, a "fully effective" legislature must be fiscally omnipotent.

This is a strange claim indeed. The U.S. Constitution itself includes many significant restrictions on legislative fiscal power. Congress is forbidden to impose taxes on exports.[2] Direct taxes must be apportioned among the states.[3] Indirect taxes must be uniform.[4] Spending is limited to "general Welfare" purposes.[5] Appropriations are restricted in various

---

[2] U.S. Const., art. I, §9, cl. 5.
[3] *Id.*, art. I, §3, cl. 3 & art. I, §9, cl. 4.
[4] *Id.*, art. I, §8, cl. 1 & art. I, §9, cl. 6.
[5] *Id.*, art. I, §8, cl. 1; *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

ways.[6]

Moreover, TABOR-like restrictions on taxes, spending, and/or debt are extremely common in state constitutions. *See generally* Robert G. Natelson & Zakary Kessler, *The Attack on Colorado's TABOR and the Threat to Other States,* Independence Institute Issue Paper 1-2013 (2013), available at http://liberty.i2i.org/2013/01/09/attack-colorado-tabor-threat-other-states/ [hereinafter Natelson & Kessler] (listing numerous provisions from many states). In fact, TABOR's requirements of approval of certain fiscal measures by referendum or super-majorities are no more restrictive—and in many cases *less* restrictive—than *per se* restrictions on legislative fiscal authority in many state constitutions. *See generally* Natelson & Kessler, *especially* at 4. Thus, if plaintiffs' stunning claim were upheld, it would threaten fiscal provisions in the constitutions of dozens of states. Even if the plaintiffs' claim is construed as extending only to restrictions imposed by initiatives and referenda,[7] it still would be inconsistent with two centuries of American

---

[6] *Id.*, art. I, §8, cl. 12 (limiting the length of military appropriations); *id*, art. I, §9, cl. 7 (other rules on appropriations); *id.*, art. I, §7, cl. 1 (revenue bills must begin in the House of Representatives);

[7] A citizen *initiative* permits voters to legislate entirely or wholly without the intervention of the legislature; a *referendum* gives the

state constitution-making. And it would blow holes in nearly every state constitution. *See generally id.*

Such a claim violates the Supreme Court's justiciability standard based on the need for stability as reflected in *Baker,* 369 U.S. at 217 (a case is not justiciable where there is "an unusual need for unquestioning adherence to a political decision already made").

## II.   Congress has, under the rule in *Luther v. Borden* and *Minor v. Happersett*, authoritatively rejected the claim that initiative and referendum is inconsistent with the republican form, thereby rendering this case non-justiciable.

In *Luther v. Borden*, 48 U.S. 1 (1849),  the U.S. Supreme Court ruled that Congress's acceptance of a state into the union is conclusive proof that it had a republican form of government at the time of acceptance. The Court held:

> Under [the Guarantee Clause] it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional

---

voters the opportunity to approve or disapprove legislative acts.

> authority. And its decision is binding on every other
> department of the government, and could not be questioned
> in a judicial tribunal.

*Id.* at 42

This rule was reaffirmed in *Minor v. Happersett,* 88 U.S. 162, 176 (1875). Since that time, at least two states have been admitted with initial constitutions reserving to the voters wide power over public policy—including fiscal policy.

In 1907, Congress admitted Oklahoma into the Union, although Oklahoma's Constitution contained very strong provisions for initiative and referendum (Okla. Const., art. V, §§1-7) and provided for a mandatory referendum before the legislature could incur debt. *Id.* art. X, §25. Similarly, in 1912, Congress admitted New Mexico with a constitution that specifically contemplated enactment of laws, including fiscal measures, by citizen initiative. N.M. Const., art. XIX, §3.

Under the rule of *Minor*, therefore, Congress already has decided authoritatively that popular restrictions on the legislature's fiscal powers are consistent with the republican form. Re-examining that question would re-open the congressional decision that states such as Oklahoma and New Mexico qualified for admission to the Union. This

renders the question non-justiciable. *See Baker*, 369 U.S. at 217 (a case is not justiciable where there is "an unusual need for unquestioning adherence to a political decision already made").

**III. Even if this case is justiciable, the plaintiffs' claim is utterly without merit, and therefore must be dismissed.**

**A. In the absence of controlling Supreme Court precedent, the phrase "republican form of government" is defined by standard sources the Supreme Court uses for interpreting constitutional language.**

Claims that initiative and referendum violate the Guarantee Clause are not new: Their opponents have raised them regularly since the nineteenth century.[8] Some state courts have decided or otherwise opined on the merits, and in doing so, generally rejected Plaintiffs' position.[9] Federal courts have not addressed the merits because, as the Defendant points out, the Supreme Court has ruled that Guarantee Clause claims are entrusted to Congress and therefore non-justiciable in federal court. For this reason, the Supreme Court has not authoritatively determined the full meaning of "republican form of government."[10]

---

[8] Natelson, *supra* note 1*,* at 842-43 (2002). *See also* AMAR, *supra* note 1, at 276.

[9] Natelson*, supra* note 1, at 810-13 (surveying case law).

[10] *Cf. Minor v. Happersett*, 88 U.S. 162, 176 (not fully construing the

To determine the meaning of a constitutional provision in the absence of binding precedent, the Supreme Court proceeds as courts generally do when interpreting any legal document: It examines the words and the contemporaneous facts and circumstances that cast light on the meaning the document held for the parties to it. For the Constitution, the relevant parties are the ratifiers. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (defining "keep and bear arms"); *Boumediene v. Bush*, 553 U.S. 723 (2008) (defining scope of habeas corpus); and *Crawford v. Washington*, 541 U.S. 36 (2004) (using materials from before and during the Founding Era to determine the scope of the Confrontation Clause).

The sources of original constitutional meaning are copious.[11] Some kinds of sources, however, have been used repeatedly by the Supreme Court, and therefore enjoy particular persuasive authority. These sources include but are not limited to:

- Founding Era dictionaries. *See, e.g., Heller,* 554 U.S. at 581 (2008)

---

Guarantee Clause, but holding that acceptance of the original states into the Union showed that the Founders understood them to have republican forms of government).

10

(citing SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE

(4th ed., 1773)) and at 584 (citing THOMAS SHERIDAN, A COMPLETE

DICTIONARY OF THE ENGLISH LANGUAGE (1796)); *McDonald v. City*

*of Chicago*, 561 U.S. ___, 130 S.Ct. 3020, 3063 n.2 (2010) (citing

PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (1788));

- Eighteenth-century political treatises relied on by the Founders,

  in particular those by eminent authors, such as John Adams. *E.g.,*

  *Lynch v. Household Finance Corp.*, 405 U.S. 538, 552 (1972)

  (citing Adams' A DEFENCE OF THE CONSTITUTIONS[12] OF THE UNITED

  STATES)) and Baron Montesquieu; *Stern v. Marshall*, ___ U.S. ___,

  131 S.Ct. 2594, 2608-09 (2011) (citing Montesquieu's THE SPIRIT

  OF THE LAWS);

- The records of the conventions that considered the Constitution;

  both the federal convention that framed it (*e.g., DaimlerChrysler*

  *Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citing MAX FARRAND,

---

11 Robert G. Natelson, *A Bibliography for Researching Original Understanding*, Independence Institute Constitution Studies, at http://constitution.i2i.org/files/2011/01/Originalist-Bibliography.pdf.
12 The title of Adams' work uses the plural "Constitutions" because it addressed the then-existing state constitutions, rather than the federal constitution, which had not been written when the first volume of the work appeared.

RECORDS OF THE FEDERAL CONVENTION OF 1787)), and the state conventions that ratified it (*e.g., Crawford*, *supra*, 541 U.S. at 48 (citing a comment at the Massachusetts ratifying convention); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 96-97 (2002) (citing a comment by James Wilson at the Pennsylvania ratifying convention)); and

- Contemporaneous publications discussing the Constitution while its ratification was still pending, including but not limited to *The Federalist. See, e.g., McDonald,* 130 S.Ct. at 3037 (2010) (citing both *The Federalist* and the Anti-Federalist "Federal Farmer" essays; *Crawford*, 541 U.S. at 49 (citing the "Federal Farmer").

As demonstrated below, those sources reveal no support for Plaintiffs' theory that the "republican form" excluded direct citizen voting on revenue measures or other laws. In fact, they strongly support the contrary position.

**B.     Eighteenth-century dictionaries define "republic" and "republican" in a way fully consistent with citizen votes on laws and taxes.**

If, during the Founding, it were widely understood that direct citizen voting on laws and taxes was inconsistent with republicanism—in other

words, that a republic must be wholly or primarily representative in form—that understanding should be reflected in contemporaneous definitions of the terms "republic" and "republican." Accordingly, using the authoritative Gale database *Eighteenth Century Collections Online* (http://gdc.gale.com/products/eighteenth-century-collections-online/), *amici* examined all available eighteenth-century dictionaries that defined either the noun "republic," the adjective "republican," or both. *Amici* also examined still another dictionary, the first American edition of William Perry's ROYAL STANDARD ENGLISH DICTIONARY, which does not appear in *Eighteenth Century Collections Online*. In all, *amici* collected nine different Founding Era dictionaries, several of which, as noted earlier, have been cited by the U.S. Supreme Court. When more than one edition was available, *amici* selected the one published closest to, but not after, the thirteenth state (Rhode Island) ratified the U.S. Constitution on May 29, 1790.

The results of this exhaustive search are instructive. Thomas Sheridan's dictionary—which the U.S. Supreme Court relied in *Heller* (554 U.S. at 584)—did not contain an entry for "republic," but it did define the adjective "republican" as: "Placing the government in the

13

people."[13] Another dictionary the Supreme Court has relied on, that of Samuel Johnson, defined "republican" the same way; and further described "republick" as "a commonwealth; state in which the power is lodged in more than one."[14]

The general approach of Sheridan and Johnson were echoed by all other lexicographers of the period. Francis Allen defined "republic" as "a state in which the power is lodged in more than one" and "republican" as "belonging to a commonwealth."[15] John Ash's dictionary asserted that a "republic" was "A commonwealth; a state or government in which the supreme power is lodged in more than one." Ash defined "republican" as "Belonging to a republic, having the supreme power lodged in more than one."[16] Similarly, Nicholas Bailey's dictionary described a republic as "a commonwealth, a free state."[17] Bailey's work contained no entry for the adjective "republican," but the noun

---

[13] THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1789) (unpaginated).

[14] 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (8th ed. 1786) (unpaginated).

[15] FRANCIS ALLEN, A COMPLETE ENGLISH DICTIONARY (1765) (unpaginated).

[16] 2 JOHN ASH, A NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1775) (unpaginated).

[17] NICHOLAS BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY

"republican" was denoted as "a commonwealth's man, who thinks a commonwealth, without a monarch, to be the best form of government."[18] Frederick Barlow's definition of a "republic" was "a state in which the power is lodged in more than one. A commonwealth." Barlow's entry for the adjective "republican" was "belonging to a commonwealth; placing the government in the people."[19] Alexander Donaldson defined "republic" simply as "commonwealth," and "republican" as "placing the government in the people."[20] In addition, the first American edition of PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (relied on in *McDonald*), defined "republic" as "a commonwealth without a king" and the adjective "republican" as "placing the government in the people."[21]

Finally, Chambers' *Cyclopaedia* presented a more lengthy treatment. It stated that a "republic" was "a popular state or government; or a nation where the body, or only a part of the people, have the

---

(25th ed. 1783) (unpaginated).

[18] *Id.*

[19] 2 FREDERICK BARLOW, THE COMPLETE ENGLISH DICTIONARY (1772-73) (unpaginated).

[20] ALEXANDER DONALDSON, AN UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE (1763) (unpaginated).

[21] PERRY'S ROYAL STANDARD ENGLISH DICTIONARY (1788) (unpaginated).

government in their own hands." It then itemized two species of republics: "When the body of the people is possessed of the supreme power, this is called a DEMOCRACY. When the supreme power is lodged in the hands of a part of the people, it is then an ARISTOCRACY." Chambers added that "The celebrated *republics* of antiquity are those of Athens, Sparta, Rome, and Carthage."[22]

*Not one of these sixteen definitions from nine different Founding-Era definitions contained the least suggestion that a republic had to be purely representative.* Indeed, these definitions of "republic" and "republican" did not require representative institutions of any kind. They required only that the government be a popular one, or at least not a monarchy. Their authors clearly saw direct democracy not as the antithesis of a republic (as Plaintiffs assert), but as a kind of republic, or at least an overlapping concept.

As explained below, this finding is consistent with a significant historical fact: When the Constitution was ratified, most republics relied heavily on direct democracy, including for revenue measures; indeed, the purely representative republic had been a rarity. The next

---

[22] 4 EPHRAIM CHAMBERS, CYCLOPAEDIA OR AN UNIVERSAL DICTIONARY OF

Part of this brief elaborates.

**C.    Leading eighteenth century political works make clear that direct citizen voting on laws and taxes is "republican."**

When the Constitution was adopted, most of the prior and contemporaneous republics known to the Founders conspicuously featured institutions of direct democracy whereby citizens voted on revenue measures and other laws.[23] These had included extremely democratic republics, such as those ruling ancient Athens and Carthage,[24] and more aristocratic republics, such as that of ancient Sparta. Even in Sparta, however, the voters enjoyed the final say over all pending legislation, not merely selected measures.[25] (By contrast, TABOR permits a citizen control only of certain fiscal measures.)

In inferring constitutional meaning, the Supreme Court often relies on important eighteenth-century political treatises.[26] Those treatises

---

ARTS AND SCIENCES (1783) (unpaginated).

[23] Natelson, *supra* note 1, at 834-35 (summarizing, as an example, the republics catalogued by John Adams).

[24] *Id.*

[25] *Id.* at 835.

[26] *E.g.*, *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (quoting Montesquieu via *The Federalist*).

reflect the historical fact that direct democracy was often a dominant institution in republican government.

Among the most important of those treatises were Baron Montesquieu's *The Spirit of the Laws* and John Adams' *A Defence of the Constitutions of the United States*. In the leading article on the subject of initiative and referendum under the Guarantee Clause,[27] Professor Robert G. Natelson collected and summarized the relevant treatments by Montesquieu and Adams. He summarized the views of Montesquieu in this way (footnotes excluded):

> Montesquieu distinguished three kinds of government: monarchies, despotisms, and republics. Both monarchies and despotisms were characterized by the rule of one person. What distinguished them was that monarchy honored the rule of law, while despotism did not. Republics were governments in which the whole people, or a part thereof, held the supreme power. Republics governed by merely a part of the people were aristocracies. Republics governed by the people as a whole were democracies.
>
> Like Madison, Montesquieu preferred purely representative government to citizen lawmaking. However, most of the states that he identified as republics authorized their citizens to make or approve all or most laws. He discussed their institutions. He opined that, in ancient times, legislative representation was unknown outside of confederate republics. "The Republics of Greece and Italy were cities that had each their own form of government, and

---

[27] Natelson, *supra* note 1, at 825.

convened their subjects within their walls." Indeed, on repeated occasions, Montesquieu specifically identified Athens—the exemplar of citizen lawmaking—as a republic. Montesquieu described the constitution of the Roman Republic [which featured direct citizen lawmaking] in great detail because "[i]t is impossible to be tired of so agreeable a subject as ancient Rome." He also classified Sparta and Carthage as well-run republics, even though they utilized direct citizen lawmaking.[28]

Adams' treatment of direct citizen lawmaking was similar. Professor Natelson writes:

> Adams was a strong supporter of the mixed constitution. . . But far from arguing that republics had to be wholly representative, he specifically cited multiple examples of republics with direct citizen lawmaking. His most important example was the Roman Republic, during the discussion of which he reproduced in his volume Polybius's essay on the Roman constitution.[29]

Adams also listed many other examples of republics that relied largely, or exclusively, on direct citizen voting on fiscal measures and other laws, including Athens, Sparta, Carthage, and various Swiss cantons.[30]

## D.    The records of the conventions that produced the Constitution show that direct citizen voting on fiscal matters and other laws is "republican."

Leading American Founders were well-grounded in history and

---

[28] *Id.* at 833-34.

[29] *Id.* at 834.

[30] *Id.* at 834-35.

political science, and particularly in the Greco-Roman classics.[31] The records of the conventions that drafted and ratified the Constitution, therefore, contain frequent references to earlier republics.[32]

*The convention records do not contain a single suggestion that direct citizen lawmaking was inconsistent with republicanism.* On the contrary, delegates frequently described as "republics" governments that relied on popular assemblies for adoption of all their laws.[33] For example, at the drafting convention in Philadelphia, both George Mason and Alexander Hamilton referred to the ancient "Grecian republics."[34]

The records contain more explicit statements as well. At the Pennsylvania ratifying convention, James Wilson distinguished "three simple species of government": monarchy, aristocracy, and "a republic or democracy, where the people at large retain the supreme power, and act *either collectively or by representation*." 2 DEBATES ON THE FEDERAL CONSTITUTION 433 (Jonathan Elliot ed., 1876) (italics added). Similarly, Charles Pinckney, who had been a leading delegate at the federal

---

[31] *See generally* CARL J. RICHARD, THE FOUNDERS AND THE CLASSICS: GREECE, ROME, AND THE AMERICAN ENLIGHTENMENT (1994).

[32] *See generally*, Natelson, *supra* note 1 (listing scores of examples).

[33] *Id.* at 816-20 (see especially the footnotes). *See also id.* at 838.

[34] 1 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 112 & 307 (Max

Convention, distinguished three kinds of government during the South Carolina ratification convention: despotism, aristocracy, and "[a] republic, where the people at large, *either collectively or by representation*, form the legislature."[35]

**E.    Commentary issued while the Constitution was still under debate, including, but not limited to, *The Federalist*, also shows that citizen lawmaking was consistent with the Guarantee Clause.**

Commentary produced during the dispute over the U.S. Constitution's ratification also gave the republican label to governments understood to feature extensive direct democracy. As Professor Natelson points out (footnotes deleted):

> In *Federalist Number 6*, Hamilton stated that "Sparta, Athens, Rome, and Carthage were all republics. . . ." In *Federalist Number 63*, Madison listed five republics: Sparta, Carthage, Rome, Athens, and Crete. In his Anti-Federalist writings, "Brutus"—probably Robert Yates, a conventions delegate from New York—stated that "the various Greek polities" and Rome were republics. Anti-Federalist author "Agrippa" (John Winthrop of Massachusetts) identified Carthage, Rome, and the ancient Greek states as republics. The Anti-Federalist "Federal Farmer" spoke of the "republics of Greece," and Anti-Federalists "A Farmer" and "An Old Whig" discussed the Roman Republic. An anonymous Anti-Federalist writer, lacking even a pseudonym, spoke of the "Grecian republics." (This list is not exhaustive as to either

---

Farrand ed., 1937).

[35] 4 id. at 328 (italics added).

Federalist or Anti-Federalist authors.)[36]

To be sure, several of the Founders expressed reservations about the *wisdom* of direct citizen lawmaking and suggested that a purely representative republic might yield superior results. Much of their concern arose from the fact that in prior republics, citizens had voted in mass assemblies subject to sudden mob-like behavior[37]—conditions quite different from those of modern initiative and referendum, in which voting in disparate locations follows lengthy campaigns. But whatever the Founders' views on its wisdom, none of the Founders suggested that direct citizen lawmaking was inconsistent with the republican form. On the contrary, they repeatedly labeled governments with direct lawmaking as "republics."[38]

This was consistent with all prior experience: When the Constitution

---

[36] Natelson, *supra* at 838. The relevant portions of *The Federalist* are No. 6 (Alexander Hamilton) and No. 63 (James Madison). *See* ALEXANDER HAMILTON, JOHN JAY & JAMES MADISON, THE FEDERALIST PAPERS: THE GIDEON EDITION 23 & 328-329 (George Carey & James McClennan eds. 2001) (discussing the "republics" of Athens, Sparta, and Carthage).

For another example, see William Duer, N.Y. DAILY PACKET, Nov. 16, 1787 (referring to ancient Athens as a republic).

[37] *See, e.g.*, *The Federalist* No. 55 (James Madison) at 288 ("Had every Athenian citizen been a Socrates, every Athenian assembly would still have been a mob").

was written, the anomaly was *not* direct citizen voting on laws in a republic, but rather creation of a new federal government without it. (No one suggested that *state* governments were denied the right to employ direct citizen lawmaking.) In fact, purely representative forms were identified more with limited monarchy than with republics.[39] Accordingly, several Founders had to explain that a purely representative federal government would have sufficient popular control to qualify as republican. For example, in *Federalist* No. 63, James Madison, *while fully acknowledging that earlier governments with direct citizen voting on laws were republics*, sought to show that those earlier governments had *also* featured some representative institutions—not instead of direct citizen lawmaking, but in addition to it.[40]

Even in Madison's time, moreover, some states employed direct citizen lawmaking. The most famous example, of course, was the town meeting, employed throughout New England. But there were other

---

[38] *See* sources in footnote 36.

[39] Natelson, *supra* note 1, at 855.

[40] *The Federalist* No. 63, at 328-29 (explaining that even the ancient republics had some representative institutions *in addition to* direct citizen lawmaking).

23

instances as well. Massachusetts ratified its State Constitution of 1780 by referendum.[41] Rhode Island conducted referenda on other subjects—including ratification of the U.S. Constitution.[42] Entry of those states into the union under the Guarantee Clause entailed recognition that those existing states had a republican form of government. *Minor v. Happersett*, 88 U.S. 162, 176 (1875).

Finally, nothing prevents a state from altering its constitution to permit more direct citizen lawmaking than it employed when it entered the union. As Madison stated in *Federalist* No. 43:

> As long, therefore, as the existing republican forms are continued by the States, they are guaranteed by the federal Constitution. Whenever the States may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter.[43]

**F.    Madison's *The Federalist* No. 10 does not mean that direct citizen lawmaking is inconsistent with the republican form.**

The sole Founding-Era citation offered by the plaintiffs to support

---

[41] Robert K. Brink, *Timeline of the Massachusetts Constitution of 1780*, Social Law Library Research Portal, http://www.socialaw.com/article.htm?cid=15747.

[42] The Constitution was rejected in Rhode Island by referendum, but later approved by convention. 3 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 30 (Merrill Jensen et al. eds., 1978) (setting forth ratification chronology).

their argument is *The Federalist* No. 10. Substituted Complaint at 3-5, ¶ 5. The plaintiffs contend that in this essay, Madison distinguished between a "representative democracy" (which the plaintiffs assert is the only permissible kind of republic) and "direct democracy." *Id.* at 3, ¶ 5. Plaintiffs erroneously report Madison's distinction, however, and they misunderstand its meaning.

As the actual extract (reproduced *id.* at 3-4, ¶ 5) demonstrates, Madison did not distinguish between a republic and *direct* democracy but instead between a republic and *pure* democracy. That difference is important because, as Professor Natelson points out, the term "pure democracy" (also called "perfect democracy") was a technical term referring not to republics with direct citizen lawmaking, but to a theoretical form of government posited by Aristotle. In that theoretical form, there were no magistrates at all, and therefore no law; day-to-day administration was conducted entirely by the mob.[44] Obviously, the

---

[43] *The Federalist* No. 43, at 225-26.

[44] Natelson, *supra*, at 846-48. *See also* ALGERNON SIDNEY, DISCOURSES CONCERNING GOVERNMENT (1698) (Thomas G. West ed., 1996), one of the Founders' favorite books of political science. Sidney referred to "perfect democracy" as a system in which "Some small numbers of men, living within the precincts of one city, have . . . cast into a common stock, the right which they had of governing themselves and children,

state of Colorado—even with all the alleged ills blamed on TABOR—
continues to employ magistrates and the rule of law. Colorado certainly
does not qualify as a "pure democracy" as Madison used the term.

Madison's other writings in *The Federalist* show that he accepted
direct citizen lawmaking as a common feature of republics. As noted
earlier, in *Federalist* No. 63 (which Plaintiffs fail to mention), Madison
labeled as "republics" several prior governments where citizens enjoyed
far more direct citizen lawmaking than permitted in Colorado. Also, in
*Federalist* No. 39 (which Plaintiffs also fail to mention), Madison
provides clarifying language in which he is clearly implies that
republics may feature direct citizen lawmaking: "[W]e may define a
republic to be, *or at least may bestow that name on,* a government which
derives all its powers *directly or indirectly* from the great body of the
people, and is administered by persons holding their offices during
pleasure for a limited period, or during good behavior."[45] Professor
Natelson provides a thorough discussion of this subject.[46]

If Madison's view had been that republics must exclude direct citizen

---

and by common consent joining in one body, exercised such power over
every single person as seemed beneficial. . . " *Id*. at 31.
[45] *The Federalist* No. 39, at 194 (emphasis added).

lawmaking, his opinion certainly would have been a remarkable one—at odds, as Professor Amar observes, with the views universally prevailing at the time.[47] In short, Plaintiffs misunderstand Madison; he, like other leading Founders, recognized that direct citizen lawmaking was a frequent, and permissible, part of republican government.

CONCLUSION

This Court should remand this case to the District Court with instructions to dismiss.

Respectfully submitted,

/s/ *David B. Kopel*

David B. Kopel
*Counsel of Record*
Independence Institute
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536 ext. 112

Ilya Shapiro
The Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 842-0200
(admission to 10th Circuit pending)

---

[46] Natelson, *supra* note 1, at 844-50.
[47] AMAR, *supra* note 1, at 276-77.

Dated: February 8, 2013

No. <u>12-1445</u>                    Caption: <u>Kerr v. Hickenlooper</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 29.1(e) or 32(a)

Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. Type-Volume Limitation: Any Reply or Amicus brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word-processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) or 32(a)(7)(B) because this brief contains 4,351 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements**: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with serifs included using Microsoft Word 2010 in 14-point Century Schoolbook.

<u>/s/ *David B. Kopel*</u>
Attorney for amici.

Dated: February 8, 2013

# CERTIFICATE OF SERVICE

The undersigned, attorney of record for *amici*, hereby certifies that on February 8, 2013, an identical electronic copy of the foregoing amicus brief was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

In addition, copies of the brief were sent via first class U.S. Mail, postage prepaid, on February 8, 2013 to:

David Evans Skaggs
Lino S. Lipinsky de Orlov
Herbert Lawrence Fenster
McKenna Long & Aldridge, LLP
1400 Wewatta Street #700
Denver, CO 80202-5556

Melissa Hart
University of Colorado School of Law
Campus Box 401
Wolf Law Building
Boulder, Colorado 80309-0401

John A. Herrick
Michael F. Feeley
Geoffrey W. Williamson
Carrie E. Johnson
Sarah Hartley
Brownstein Hyatt Farber Schreck, LLP
410 17th Street #2200
Denver, CO 80202-4432

Daniel D. Domenico
Solicitor General
Frederick R. Yarger Assistant Solicitor General
Bernie Buescher

Deputy Attorney General
Megan Paris Rundlet
Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203


*s/ David B. Kopel*
Attorney for amici.

Dated: February 8, 2013